```
 1  MARC J. FAGEL (Cal. Bar No. 154425)
    MICHAEL S. DICKE (Cal. Bar No. 158187)
 2  JOHN S. YUN (Cal. Bar No. 112260)
       (yunj@sec.gov)
 3  SHEILA E. O'CALLAGHAN (Cal. Bar No. 131032)
       (ocallaghans@sec.gov)
 4  KRISTIN A. SNYDER (Cal. Bar No. 187175)
       (snyderk@sec.gov)
 5
    Attorneys for Plaintiff
 6  SECURITIES AND EXCHANGE COMMISSION
    44 Montgomery Street, Suite 2600
 7  San Francisco, California 94104
    Telephone:  (415) 705-2500
 8  Facsimile:  (415) 705-2501
```

E-filing

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

SECURITIES AND EXCHANGE COMMISSION,    Case No. CV 08 4088

    Plaintiff,

    vs.

MARK JOSEPH PETERSON BOUCHER and
GARY PAUL JOHNSON,

    Defendants.

COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges:

### SUMMARY OF THE ACTION

1.    Defendants Mark Joseph Peterson Boucher, a Portola Valley investment adviser and publisher of an investment newsletter, and Gary Paul Johnson, part owner of a Southern California real estate development company, defrauded investors out of nearly $20 million. From 1999 through 2005, Boucher and Johnson solicited investors (primarily from Boucher's advisory clients) to invest in two real estate development companies by falsely promising that the investments were secured by real property with little debt. In reality, the investments were not secured at all: one of the

COMPLAINT

1. companies never owned any property, and the other owned a single property whose debts exceeded its potential profits. In addition to these misrepresentations, Johnson diverted over $1.5 million in investor funds for his personal use. Similarly, Boucher used investor money to make mortgage payments on his home, and failed to disclose to investors that he had been promised secret compensation for his fundraising efforts. In the end, neither company successfully developed a real estate project, and thus investors lost millions of dollars.

2. Boucher violated the federal securities laws, including the antifraud statutes, by falsely representing, or omitting material information, regarding the safety and security of the real estate investments, for misappropriating investor funds and for touting the investments without disclosing to investors that he had been promised compensation. Johnson violated the federal securities laws, including the antifraud statutes, by misappropriating investor funds and making materially false and misleading statements in connection with the purchase or sale of securities. The Commission seeks to enjoin Boucher and Johnson from further conduct that violates the securities laws and seeks civil money penalties from each of them. The Commission further seeks disgorgement of ill-gotten gains from Johnson.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

3. The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)], Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)], and Sections 209 and 214 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9 and 80b-14]. This Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d)(1) and 77v(a)], Sections 21(d)(3), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(e), and 78aa], and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14].

4. Venue in this district is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because defendant Boucher resides in, and a substantial portion of the conduct alleged in this complaint occurred within, the Northern District of California.

COMPLAINT                              -2-

5. Assignment to the San Francisco Division of this Court is proper because a substantial part of the events or omissions that give rise to claims alleged in this Complaint occurred in San Mateo County. In addition, defendant Boucher resides in San Mateo County, and some of the defrauded investors and advisory clients reside in this Division.

**DEFENDANTS**

6. Defendant Mark Joseph Peterson Boucher ("Boucher"), age 46, resides in Portola Valley, California. He founded and controls a sole proprietorship called Investment Research Associates that, since at least 1998, has published a monthly subscription-only investment newsletter called the Portfolio Strategy Letter. Since at least 1999, Boucher has also provided investment advice to clients in exchange for a fee. He is also the author of a book on hedge fund investing titled *The Hedge Fund Edge*.

7. Defendant Gary Paul Johnson ("Johnson"), age 53, resides in Westlake Village, California. Johnson was the principal of DCM L.P. ("DCM"), a California limited partnership, formed in 1998 to hold a 20% ownership interest in Sunquest Development, LLC ("Sunquest"), a privately-owned California real estate development company. Johnson was responsible for raising funds for Sunquest. Through DCM, Johnson also raised funds for another private California real estate development company, Pinnacle West, LLC ("Pinnacle").

**FACTUAL ALLEGATIONS**

A. **Boucher's And Johnson's Involvement With The Pinnacle And Sunquest Promissory Note Investments**

8. Boucher is a well-known investment adviser who wrote a book on investing, hosts seminars on investing, and co-founded an investment web site. He founded and controls a sole proprietorship called Investment Research Associates that, since at least 1998, has published a monthly subscription-only investment newsletter called the Portfolio Strategy Letter. Since at least 1999, Boucher has also provided investment advice to clients through two companies he formed in the Bahamas. While Boucher has never registered with the Commission as an investment adviser, since at least the mid-1990's he has provided investment advice to United States clients in exchange for a fee.

COMPLAINT                                -3-

9. Starting in 1999 and continuing through 2005, Boucher invested millions of dollars of his advisory clients' funds, or recommended his clients invest their funds, in promissory notes issued by Pinnacle and Sunquest. Boucher's clients supplied most of the money invested in both entities. Boucher began as a passive investor—or conduit for his clients' investment money—but over time he assumed greater and greater control of both companies. As a result of the actions alleged herein, Boucher and Johnson defrauded investors out of nearly $20 million.

10. When both Sunquest and Pinnacle were formed in 1998, they had minimal operating capital and needed financing to acquire and develop large scale real estate projects. Boucher was solicited to invest in both companies by Johnson, who was raising funds for Sunquest and who had also been engaged by Pinnacle's owner to raise funds for Pinnacle in exchange for a promised finder's fee.

11. Sunquest is a private California company formed in 1998 by Johnson and several others for the purpose of buying and developing a large scale real estate project in Southern California. From 1998 through 2004, Johnson solicited investors, including Boucher and his clients, to put money into Sunquest. In 1999, Sunquest was able to acquire the property in Southern California using investor funds. Beginning in 2002, the property that Sunquest held had its ownership transferred to several successor entities. The final entity that controlled the property, Branford Partners LLC, filed for Chapter 11 bankruptcy in December 2006, and ultimately the property was liquidated.

12. Pinnacle is a private California company, primarily owned by one individual, formed in 1998 to acquire and develop large scale real estate projects. In 1999, shortly after its formation, Pinnacle had approximately six specific properties under option or under purchase agreements that had not been completed. Ultimately, however, Pinnacle never acquired ownership of any property.

13. Generally, investors in both Pinnacle and Sunquest received promissory notes in exchange for their investments that promised to pay interest ranging from 12% to 20% per year. The notes generally promised full repayment after a period ranging from twelve to twenty-four months, although they typically contained a rollover provision that allowed for additional extensions of time on repayment.

COMPLAINT                                -4-

### B. Boucher Falsely Represented To Clients That The Pinnacle And Sunquest Notes Were Backed By "Trust Deeds" Or Owned Property

14. From 1999 through 2005, Boucher falsely told his clients that the Pinnacle and Sunquest notes would be secured by property the companies owned. The written materials provided to investors, including the promissory notes, falsely stated that investors were receiving "collateral" for their investments. For instance, an exhibit to each Pinnacle note describes various properties as security for the notes, and states that the "following properties referred to herein are to be used as security and collateral for enforcing collection of this note should default occur." The Sunquest notes contain a similar provision, and list its sole owned property as collateral. Boucher also made these representations to clients during in-person meetings, in letters and in emails, as well as in his investment newsletter that was provided to clients.

15. In reality, however, both the Sunquest and the Pinnacle notes were unsecured. In the case of Pinnacle, it never owned any property. Pinnacle merely held option agreements that never materialized into final purchase contracts, or entered into purchase agreements that never closed escrow. In the case of Sunquest, no liens or trust deeds were placed against the property in the name of the investors to secure their investments. Thus, investors had no true "security interests" in property that they could pursue if Pinnacle or Sunquest failed to repay the notes.

16. From 1999 forward, Boucher was aware that neither company was securing investors' investments with trust deeds based upon his involvement with the projects and his contacts with the principals at both companies.

17. Boucher knew, or was reckless in not knowing, the statements he made to clients and other investors were false and misleading.

### C. Boucher Falsely Represented To Clients That the Pinnacle And Sunquest Notes Were Backed By At Least A 50% Loan-To-Value Ratio

18. Boucher also misled investors about the amount of equity backing the Pinnacle and Sunquest notes. Boucher repeatedly told investors that the properties held by Pinnacle and Sunquest had enough value so that the debt the companies were incurring amounted to less than 50% of the equity in their projects. Thus, if investors sought to recover their investments from either company,

COMPLAINT                                    -5-

the collateral would be at least double the debt. Based on this purported low loan-to-value ratio, Boucher represented that investments in Pinnacle and Sunquest notes were low risk and well protected. Boucher's statements were misleading because Pinnacle never owned property and, by the summer of 2002, Sunquest's one property was heavily debt laden.

19. With respect to Pinnacle, from at least 2000 through 2005, Boucher consistently misrepresented to clients that Pinnacle's projects had substantial equity, making written statements representing that the loan-to-value ratios on the projects was a "phenomenally low 21%," or the notes had "4:1 equity to debt" or the notes were backed by "double collateral."

20. Although Sunquest owned one property, by the summer of 2002, Boucher was aware that the property was in financial trouble. In September 2002, Boucher had an accounting done of all of Sunquest's debts because Boucher was agreeing to raise an additional $5 million in note sales. In the fall of 2002, Boucher received detailed spreadsheets showing that Sunquest's debts, including the unpaid principal and interest on the promissory notes, exceeded the potential profits from the project. In December 2002, Boucher expressed his concerns in a written memorandum that Sunquest's debts were higher than the potential profits for the Sunquest project.

21. Boucher did not tell his advisory clients or other investors about Sunquest's financial problems, and instead induced several of his clients to provide an additional $5 million in funding. Boucher also continued to recommend purchasing Sunquest notes in his subscription-based newsletter.

22. Boucher knew, or was reckless in not knowing, that his statements to his advisory clients and other investors were false and misleading.

C. **Johnson and Boucher Misappropriated Investor Funds for their Own Use**

23. From roughly 1999 through 2004, Johnson called prospective investors by telephone to pitch both the Pinnacle and Sunquest promissory note investments. During these sales pitches, Johnson represented to investors that their investment funds would be used to advance the real estate projects that Pinnacle and Sunquest were pursuing.

24. When investors indicated their willingness to invest, during at least the time period January 2002 through March 2004, Johnson directed them to send their money by wire or by check to

his company, DCM, and the wires or checks were then deposited into a bank account Johnson controlled.

25. Rather than sending all of the money to either Pinnacle or Sunquest for use on their respective real estate projects, from the beginning, Johnson took large undisclosed and unauthorized "draws" and "loans" from the Sunquest investor funds, which impacted Sunquest's ability to make progress on the development and its ability to repay investor notes. From January 2002 to March 2004 alone, Johnson raised $4.6 million from the sales of Sunquest notes through calling potential investors, including numerous Boucher clients, and then diverted more than $1.5 million of the money he raised for personal expenses and to fund an unrelated furniture business (which subsequently failed).

26. Johnson's spending did not go unnoticed by Boucher. Boucher admonished Johnson to curtail his personal use of investor funds. For instance, in April 2001, Boucher wrote a letter to Johnson in which he stated that he was aware of Johnson's misuse of investor funds and advised him to repay investors. Despite his concerns about embezzlement and non-payment, however, Boucher continued to provide glowing recommendations of the notes, and continued to direct client investments in the notes.

27. Ironically, after complaining to Johnson about his misappropriation of investor funds, Boucher also used investor money for his personal expenses without authorization or disclosure. For example, when Boucher purchased a residence for $2 million in 2000, he directed Johnson to send investor money earmarked for Sunquest to an escrow for part of the mortgage payments. The investors whose money was used to make Boucher's house payments did not give Boucher permission to use their money for payments on his residence.

28. Johnson and Boucher knew, or were reckless in not knowing, that the statements they made to investors were materially false and misleading, and that they were misappropriating funds by using investor money for personal expenses contrary to their representations to investors.

**D. Boucher Was Promised Undisclosed Compensation for Raising Funds**

29. Beginning in 1999, Boucher was promised compensation by Pinnacle and Sunquest for raising investor money. Specifically, based on Boucher's efforts to "coordinate and bring

investment funds" to Sunquest, he received a 5% ownership interest in Sunquest and was promised a fee of $250,000 (although the money was never actually paid). As early as December 1999, Boucher began recommending the Sunquest promissory note investments in his monthly investment newsletter to clients, the Portfolio Strategy Letter, which was mailed or emailed to clients.

30. In May 2000, Boucher agreed to raise additional investor money for Pinnacle. Although Boucher ultimately did not receive it, he was promised title to a 5,000 square foot home in one of Pinnacle's planned developments as compensation for his fundraising efforts. By June 2000, Boucher began recommending in the Portfolio Strategy Letter that investors place as much as 10% of their net worth in Pinnacle note investments.

31. Boucher did not disclose to his advisory clients or other investors this conflict of interest, namely that he had been promised compensation for his fundraising efforts for both Pinnacle and Sunquest.

E. **The Majority of Pinnacle and Sunquest Investors Have Yet To Be Repaid**

32. By early 2005, nearly all of the fundraising for the Pinnacle and Sunquest offerings had ceased. Neither company has ever completed a real estate project, or secured longer-term financing, that allowed it to repay investors. In December 2006, Sunquest's successor, Branford Partners, LLC, filed for bankruptcy, and its one still-undeveloped property was sold in May 2007 for $18.75 million, which did not provide a single dollar of recovery to unsecured investors in Sunquest's promissory notes. Despite the Sunquest bankruptcy and Pinnacle's lack of assets, Boucher has continued to tell investors that they will be repaid.

33. In late 2004, Boucher began to tell his clients and other investors that they would receive repayment of the principal and accrued interest on their Pinnacle and Sunquest notes once a United Kingdom based company completed an initial public offering ("IPO") on the United Kingdom Alternative Investment Market. Boucher has told investors that this company intends to assume all outstanding Pinnacle and Sunquest debt. Boucher's advisory clients and the other investors have received numerous updates promising repayment, but then the money has never materialized.

34. Although the IPO has yet to occur and investors have not been paid, Boucher continues to engage in this lulling conduct. In a recent update sent to his clients on March 6, 2008,

1 | Boucher stated that the UK-based principal had purportedly suffered a ruptured Eustachian tube and
2 | was just released from quarantine after contracting a virus from a mosquito bite he received in China,
3 | but promised that the IPO is still on track. In fact, Boucher misled his advisory clients as he had no
4 | reasonable basis to assure his clients that the IPO would occur and that they would ever be repaid.

5 | 35.  Boucher knew, or was reckless in not knowing, that the statements to investors about
6 | repayment were materially false and misleading.

## FIRST CLAIM FOR RELIEF

**(Violations of Section 17(a) of the Securities Act Against Boucher and Johnson)**

36.  The Commission realleges and incorporates by reference paragraphs 1 through 35.

37.  By engaging in the acts and conduct alleged above, Johnson and Boucher, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: (a) with scienter employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

38.  By reason of the foregoing, Boucher and Johnson have violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder Against Boucher and Johnson)**

39.  The Commission realleges and incorporates by reference Paragraphs 1 through 35.

40.  By engaging in the acts and conduct alleged above, Boucher and Johnson, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, with scienter: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

41. By reason of the foregoing, Boucher and Johnson have violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §§ 240.10b-5] thereunder.

### THIRD CLAIM FOR RELIEF

**(Violations of Section 206(1) and 206(2) of the Advisers Act Against Boucher)**

42. The Commission realleges and incorporates by reference Paragraphs 1 through 35.

43. By engaging in the acts and conduct alleged above, Boucher, directly or indirectly, or in the alternative as an aider and abettor, through use of the means or instruments of transportation or communication in interstate commerce or of the mails, and while engaged in the business of advising others for compensation as to the advisability of investing in, purchasing, or selling securities: (a) employed devices, schemes, and artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients.

44. By reason of the foregoing, Boucher has violated and, unless restrained and enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

### FOURTH CLAIM FOR RELIEF

**(Violations of Section 17(b) of the Securities Act Against Boucher)**

45. The Commission realleges and incorporates by reference Paragraphs 1 through 35.

46. By engaging in the acts and conduct alleged above, Boucher violated Section 17(b) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(b)] by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an

issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

47. By reason of the foregoing, Boucher has violated and, unless restrained and enjoined, will continue to violate Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

I.

Permanently enjoin defendant Boucher from directly or indirectly violating Sections 17(a) and 17(b) of the Securities Act [15 U.S.C. § 77q(a) & 15 U.S.C. § 77q(b)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

II.

Permanently enjoin defendant Johnson from directly or indirectly violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

III.

Order defendants Boucher and Johnson to pay civil money penalties pursuant to Section 20(d)(1) of the Securities Act [15 U.S.C. § 77t(d)(1)], and Section 21A of the Exchange Act [15 U.S.C. § 78u-1], and, as to Boucher only, Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

IV.

Order defendant Johnson to disgorge all ill-gotten gains according to proof, plus prejudgment interest.

V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

VI.

Grant such other and further relief as this Court may deem just, equitable, and necessary.

Dated: August 27, 2008

Respectfully submitted:

By: _____
Marc J. Fagel
Michael S. Dicke
John S. Yun
Sheila E. O'Callaghan
Kristin A. Snyder

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION